1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BOARDWALK CONDOMINIUM ASSOCIATION, a California non-profit mutual benefit corporation, | Civil No.03cv505 WQH (WMc) |
| Plaintiff, | **ORDER** |
| v. | (Doc. # 105) |
| TRAVELERS INDEMNITY COMPANY OF ILLINOIS; and DOES 1 through 50, inclusive, | |
| Defendants. | |

HAYES, Judge:

   The matter before the Court is the Motion for Summary Judgment (Doc. # 105) filed by Defendant Travelers Indemnity Company of Illinois ("Travelers").

                                   **FACTS**

   On October 21, 2000, Travelers issued a business insurance policy to Plaintiff Boardwalk Condominium Association ("Boardwalk"), No. I-680-371D2015-TIL-01 (the "policy"), providing coverage for loss to the "Boardwalk Condominium" property located at 8330-8840 Villa La Jolla Drive in San Diego County, California, for the policy period October 12, 2000 to October 12, 2001.

                                       1

1    (Fact 1.)[1]  The parties renewed the policy for the period October 12, 2001 to October 12, 2002. (Fact
2    3.)

3         During the summer of 2001, the residents of two condominiums on the third floor of Building
4    8840 notified Boardwalk that their units were were seriously water damaged and contaminated with
5    mold.  (Fact 105.)  On August 28, 2001, Boardwalk notified its insurance broker of the potential
6    loss, and the broker tendered the claim to Travelers on September 28, 2001.  (Facts 34-35.)  Karen
7    Blanchard, a Travelers claims adjuster, interviewed Boardwalk's property manager on October 1,
8    2001 (Fact 37); retained Building Analysts, a forensic architectural and engineering firm, to
9    determine the cause of loss on October 3, 2001 (Fact 39); and visited the Boardwalk property on
10   October 4, 2001 (Fact 40).

11        On December 7, 2001, Blanchard spoke with a Building Analysts representative, who stated
12   that there was evidence of a roof leak.  (Fact 107.)  On December 10, 2001, Building Analysts
13   submitted a report stating, "[b]ased solely on our observations, we have concluded that most of the
14   stains on the ceilings and walls are caused by roof leaks."  (Fact 41.)  On December 12, 2001,
15   Blanchard noted that a limitation on damage resulting from rain had been deleted from Boardwalk's
16   policy by endorsement and concluded that the interior water damage was covered.  (Facts 107-08.)
17   On the same day, Blanchard informed the assistant to Boardwalk's property manager in a telephone
18   call that there appeared to be coverage for the interior water damage.  (Fact 109.)

19        On January 8, 2002, Blanchard called Boardwalk's property manager and stated that there
20   must have been a miscommunication with her assistant, because no remediation work had begun on
21   the property when remediation had been authorized.  (Fact 112.)  Blanchard advised Boardwalk that
22   the unit owners could use their own contractors, although Blanchard needed to be "kept in the loop."
23   (Fact 112.)

---

26        [1]  The parties each submitted a Statement of Material Facts with their submissions in
27   support of and in opposition to the Motion for Summary Judgment.  The Court relies upon facts
     from Travelers' Statement of Materials Facts which are undisputed by Boardwalk and supported
     by the cited evidence, and facts from Boardwalk's Statement of Additional Material Facts
28   supported by the cited evidence and not subject to an objection by Travelers which is sustained
     by the Court.

03cv505

1      On January 11, 2002, a roofer retained by Boardwalk informed Blanchard that there were no
2  roof leaks, but that lack of ventilation might be allowing excessive moisture to be trapped under the
3  roof and causing the damage to the third floor units.  (Fact 114.)  On February 3, 2002, a forensic
4  architect hired by Travelers identified as possible causes of loss the following sources of water
5  intrusion: window leaks, "which can be a major contributor to mold problems in the units"; minor
6  water intrusion around fireplaces; lack of adequate ventilation in the bathrooms; lack of outside
7  ventilation for clothes dryers, which is "a major source of water intrusion"; and lack of roof cavity
8  ventilation, "which can be another contributing factor toward promoting mold growth." (Facts 49,
9  118.)

10      On February 7, 2002, Blanchard, her supervisor, and a property reinspector discussed
11  Boardwalk's claim noting that there were several possible causes of loss and that it would be
12  difficult to apportion the resulting damage among them.  (Fact 119.)  They concluded that the
13  damage caused by the leaking windows, leaks around the fireplaces, and the lack of dryer vents was
14  covered.  (Fact 119.)  On February 20, 2002, after inspecting several of the units of Building 8840
15  with a property re-inspector and a restoration contractor, Blanchard noted all 18 third-floor units of
16  Building 8840 would likely have damage requiring repair.  (Fact 121.)

17      On March 1, 2002, Boardwalk sent Blanchard its estimates for the remediation and
18  restoration of Unit 308 of Building 8840, totaling $42,800.  (Fact 123.)  On March 1, 2002,
19  according to Blanchard's Claim File Notes, "a partial payment of $50,000 [was] forwarded to the
20  insured as there is damage caused by covered causes of loss.  We anticipate that these damages will
21  exceed this partial payment, however we cannot determine this amount until our investigation is
22  complete." (Fact 124.)  Blanchard sent a letter on March 1, 2002, notifying Boardwalk of the
23  "partial payment," reiterating a previous request for further documentation, and reserving "any
24  rights or defenses [Travelers] may have under its policy or any applicable regulation or law." (Facts
25  51, 124.)

26      On March 4, 2002, Boardwalk's claim was transferred to Dennis Luoma, an adjuster for
27  Travelers' "Major Cases Unit."  (Fact 125.)  On March 25, 2002, Luoma sent a letter to Boardwalk's
28  property manager requesting 16 categories of documents and other information.  (Fact 53.)

Receiving no response, Luoma re-sent the letter requesting the documents on May 6, 2002 and June 19, 2002. (Fact 54.) On July 2, 2002, Boardwalk's attorney sent a letter to Luoma objecting to the broad scope of documents requested by Luoma, but stating: "Nevertheless, in the spirit of cooperation, the board is willing to produce these records for your inspection and copying at a reasonable time, either on site or at the offices of their management company." (Facts 59-60; Mendoza Decl. ¶ 6, Ex. E.)[2]  On July 31, 2002, Luoma again re-sent his previous letter to Boardwalk's property manager requesting the 16 categories of information. (Fact 54.)

On August 19, 2002, Alice Whitted, the President of Boardwalk's Board of Directors, wrote to Luoma, informing him that "[Boardwalk's] records are open to your inspection and if someone representing your office attempts to view the documentation, they will be greeted warmly." (Facts 55, 129.) On October 4, 2002, Whitted sent a letter to Luoma, informing him that Boardwalk was in a "critical" financial situation because it was unable to get a loan to pay over $300,000 owed to various vendors performing work on the damaged units, and Boardwalk had been forced to impose a special assessment on all of its homeowners. (Fact 131.) She asked him to "[p]lease consider expediting our claim immediately, or at the very least give us some relief in this critical situation." (Fact 131.) On October 7, 2002, Whitted again wrote Luoma, repeating the information in her previous letter, and noting that Boardwalk had spent over $500,000 on the remediation and restoration which had depleted its reserves. (Fact 133.) She concluded: "We would very much appreciate it if you would expedite our Claim immediately or at the very least give us some relief so work might be continued.  We are in a very difficult and critical situation and need your help." (Fact 133.)

On October 8, 2002, Luoma sent a letter to Boardwalk's property manager stating that Travelers had not received the documentation Travelers had requested and Luoma enclosed copies of his previous requests for documentation. (Fact 56.) On October 9, 2002, Boardwalk's attorney sent Luoma a letter indicating that Boardwalk was "endeavoring to collect that information and

---

[2]  Luoma testified that he did not see this letter until January 2003. (Luoma Decl. ¶ 14.) Viewing the evidence in the light most favorable to Boardwalk, the Court assumes that Boardwalk's counsel mailed the letter on July 2, 2002, and that Travelers received it, even if it did reached Luoma. (*See* Mendoza Decl. ¶ 6, Ex. E; DeMetrius Decl., Ex. 53.)

03cv505

provide it to you in a timely manner.  However, it is our understanding that this information is not required for Travelers to determine if there is coverage for the above-referenced claims." (Fact 57.) On October 22, 2002, Luoma wrote again to Boardwalk's management company and renewed his requests for various documents.  (Fact 58.)  On November 15, 2002, Boardwalk's counsel wrote to Travelers' counsel, referencing the two letters from Boardwalk (i.e., the July 2, 2002 letter from Boardwalk's counsel and the August 19, 2002 letter from the President of Boardwalk's Board of Directors) inviting Travelers to review and copy the requested documents.  (Facts 59, 137.)  On December 13, 2002, Travelers' counsel responded to Boardwalk's counsel "reiterat[ing] the requests for information contained in Mr. Luoma's March 25, 2002 letter." (Fact 138(a).)  On December 16, 2002, Boardwalk's counsel replied that "[i]f Travelers is interested in viewing the documents it has been requesting, please contact our office and we will coordinate a time."  (Fact 138(b).)

On December 19, 2002, Travelers' counsel wrote to Boardwalk's counsel, "we again reiterate our request for the information contained in the March 25, 2002 letter.  If the Association remains willing to provide us access to the documents . . . please advise."  (Fact 139.)  On December 20, 2002, Boardwalk's counsel responded that "Travelers has consistently ignored any offer to view documents and/or copy those documents at the insured[']s premises or at its manager's site. . . .  If Travelers is truly interested in inspecting, examining and/or copying these documents, it should have taken the insured up on its invitation months ago."  (Fact 140.)  On January 3, 2003, Travelers' counsel wrote, asking if Boardwalk was now refusing to provide the requested information, and if not, to provide it as soon as possible to Luoma.  (Fact 141.)  On January 3, 2003, Boardwalk's counsel replied:

> The insured, Boardwalk Association, now has on five (5) occasions offered the insurance company the opportunity to inspect and copy its documents, and all such invitations have been ignored by the insurance company. . . .  As we informed you previously in our letters, the insured is not obligated to produce five and a half bankers' boxes full of documents, or go through them and try to guess which documents are important to the insurance company in order to prove or disprove coverage. . . .  On December 16, 2002, we again wrote to your office, and to Travelers, and stated the following: 'If Travelers is interested in viewing the documents it has been requesting, please contact our office and we will coordinate a time.'  Rather than respond to this invitation, by making one simple phone call, you chose to make the following disingenuous and irresponsible response: '(1) Is the insured refusing to respond to Travelers' request for information set forth in Travelers' letter of March 22, 2002? (2) Is the insured now refusing to provide Travelers with access to the documents that were ostensibly offered in its July 2, 2002

03cv505

letter?' . . . . [W]hich part of 'If Travelers is interested in viewing the documents it has been requesting, please contact our office and we will coordinate a time' do you not understand?

(Fact 142.) On January 13, 2003, Travelers' counsel wrote that he would coordinate the inspection and copying of Boardwalk's files at the property manager's office. (Fact 143.) On January 23, 2003, Travelers copied documents from Boardwalk's files. (Fact 61.)

In a letter dated April 8, 2003, Luoma denied Boardwalk's claim in its entirety. (Fact 62.) Luoma wrote that the claimed damage manifested prior to the inception of the first policy issued by Travelers to Boardwalk and therefore was excluded by the policies. (Fact 62.) He also listed many other exclusions in the policies, including the mold and design defect exclusions, and indicated that "to the extent the claims result from" excluded conditions, the policies did not provide coverage. (Fact 62.) Luoma further wrote: "It is also the position of Travelers that the insured failed to cooperate in our investigation of this matter, by . . . failing to respond to requests for information issued in connection with Travelers' claim investigation and by failing, until recently, to provide access to requested records and other documents for Travelers' review." (Fact 62.)

Boardwalk expended over a million dollars to repair the property damage to the third floor units of Building 8840. (Fact 78.)

On February 5, 2003, Boardwalk filed a Complaint against Travelers in the Superior Court of California for the County of San Diego, asserting three causes of action. Boardwalk contends that Travelers breached its insurance contract by, *inter alia*, failing to pay Boardwalk policy benefits, failing to conduct a prompt, full and complete investigation of Boardwalk's claims, failing to advise Boardwalk in a timely manner of the status of its claim, failing to respond to communications with respect to the claim and failing to affirm or deny coverage within a reasonable time. (Compl. ¶¶ 37, 42.) Boardwalk next contends that Travelers' alleged breach of the insurance contract was in bad faith and with malice, fraud or oppression, and with the intent to injure Boardwalk, thereby entitling Boardwalk to punitive damages. (Compl. ¶ 50.) Boardwalk's third cause of action is for declaratory relief, seeking a determination of coverage and the rights and duties of each of the parties. (Compl. ¶¶ 54, 57.) On March 13, 2003, Travelers removed the action to this Court. (Doc. # 1.)

03cv505

1    On February 6, 2004, Travelers filed its first Motion for Summary Judgment (Doc. # 22),

2  asserting that Boardwalk's claim was precluded under the "manifestation rule," and that the claim

3  was excluded under the mold/fungus exclusion, the "acts and decisions" exclusion, and/or the

4  design/construction defects exclusion.  On August 3, 2004, the Court granted summary judgment

5  in favor of Travelers, based exclusively on the holding that Boardwalk's claim was barred by the

6  "manifestation rule."  (Doc. # 69.)  The Court did not reach the other arguments in the Motion for

7  Summary Judgment.  On June 8, 2006, the Ninth Circuit reversed this Court's grant of summary

8  judgment, holding that the application of the "manifestation rule" was unwarranted "because there

9  was a genuine issue of material fact regarding whether Boardwalk's 'loss [was] continuing and

10 progressive . . . [or] was a series of discrete events.'"  *Boardwalk Condominium Ass'n v. Travelers*

11 *Indem. Co. of Ill.*, 198 Fed. Appx. 599, 600, 2006 WL 2348111, *1 (9th Cir. 2006) (quoting *Central*

12 *Nat. Ins. Co. v. Superior Court*, 2 Cal. App. 4th 926, 933-34 (1992)).  The Ninth Circuit did not

13 reach the other arguments in the Motion for Summary Judgment.

14    On February 27, 2007, Travelers again moved for judgment in its favor as a matter of law on

15 the grounds that: (1) Boardwalk's claim is excluded under the mold/fungus exclusion, and/or the

16 exclusion for loss caused by construction or design defects; (2) Boardwalk's claim that Travelers

17 breached the implied covenant of good faith and fair dealing fails because Travelers did not deny

18 benefits in bad faith; and (3) Boardwalk's claim for punitive damages fails because Travelers has

19 not been guilty of "oppression, fraud or malice."  After receiving evidence and briefing from the

20 parties, the Court conducted oral argument on April 9, 2007.

21                                    **APPLICABLE STANDARD**

22    Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure

23 where the moving party demonstrates the absence of a genuine issue of material fact and entitlement

24 to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477

25 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect

26 the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute

27 over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict

28 for the nonmoving party."  *Id.*

03cv505

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. If the moving party satisfies its initial burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

In ruling on a motion for summary judgment, the Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations [and] the weighing of evidence . . . are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## DISCUSSION

### A.    Applicable Law

Federal courts in California sitting in diversity jurisdiction apply the same choice of law rules as California state courts. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). To establish the breach of an insurance policy under California law, the insured has the initial burden of showing that its claim falls within the scope of the insuring provision of the policy. *See Royal Globe Ins. Co. v. Whitaker*, 181 Cal. App. 3d 532, 537 (Cal. Ct. App. 1986). If the insured satisfies this initial burden, then the burden shifts to the insurer to come forward with evidence that one or more policy exclusions apply to prevent coverage. *See id*.

In this case, there is no dispute that the policies issued to Boardwalk were "all-risk" business owners property policies, and that certain of the property covered (specifically, the third floor units of Building 8840) sustained physical loss or damage. Travelers bears the burden of showing that one or more policy exclusions apply to prevent coverage.

### B.    Mold/Fungus Exclusion

#### 1.    Relevant Policy Language

The policies at issue provide that Travelers "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a

03cv505

Covered Cause of Loss." (DeMetrius Decl., Ex. 1 ("2000-01 Policy") at 305 & Ex. 2 ("2001-02 Policy") at 422.) The policies define a "Covered Cause of Loss" as "Risks of Direct Physical Loss unless the loss is: a. Limited in Paragraph A.5., Limitations; or b. Excluded in Section B., Exclusions." (2000-01 Policy at 306; 2001-02 Policy at 424.)

The policy effective during 2000-01 excluded from coverage "loss or damage caused by or resulting from . . . (2) Rust, corrosion, *fungus*, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself. . . ." (2000-01 Policy at 314 (emphasis added).) The policy effective during 2001-02 excludes from coverage "loss or damage caused by or resulting from . . . (2) Rust, corrosion, *fungus*, decay, deterioration, wet or dry rot, *mold*, hidden or latent defect or any quality in property that causes it to damage or destroy itself. . . ." (2001-02 Policy at 438 (emphasis added).) With respect to the mold/fungus exclusion, the difference in the language between the two policies is not treated as significant by either party,[3] and will not be treated as significant by the Court.

## 2. Discussion

Travelers argues that summary judgment is appropriate because "all of Boardwalk's damages claims in this action are related to mold remediation, and the repairs Boardwalk was required to undertake [to] the various units [were] due to the remediation. Travelers' policies expressly exclude coverage for all loss or damage caused by or resulting from fungus and mold." (Mem. Supp. Summ. J. at 11.)

Boardwalk responds that Travelers mischaracterizes its claim when it asserts that Boardwalk's "damage" is the cost of repairs "caused by mold damage." Boardwalk relies upon the following policy language, "[Travelers] will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss." (2000-01 Policy at 305; 2001-02 Policy at 422.) Boardwalk asserts that it "suffered 'direct physical loss or damage' (water staining, saturation, mold) to 'Covered Property' (Building 8840) caused by a 'Covered Cause or Loss' (water intrusion)." (Mem. Opp'n Mot. Summ. J. at 8.) Boardwalk argues that mold which

---

[3] In its brief, Boardwalk states that it "has never disputed . . . that mold is a type of fungus." (Mem. Opp'n Def.'s Mot. Summ. J. at 8.)

03cv505

occurs naturally in the environment over time can be an excluded peril, but mold damage resulting from a covered cause of loss (such as water intrusion, as alleged in this case) is covered. According to Boardwalk: "[T]he policy does not automatically exclude all fungus/mold. Fungus/mold that is not the cause of loss, but is the loss itself, is covered if it results from a covered cause of loss." (Mem. Opp'n Mot. Summ. J. at 12.) In support of this argument, Boardwalk relies upon cases from four states other than California holding that mold can be a peril and/or a loss, which is to say, mold can be both a "loss" and a "cause of loss." *See Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 455, 462-63 (W.D. Ky. 2007); *DeLaurentis v. United Servs. Auto. Ass'n*, 162 S.W. 3d 714, 724 (Tex. Ct. App. 2005) ("We do not share the Insurer's narrow view, but find that mold may be either damage or a cause of loss, depending on the circumstances.") (quotation and citations omitted); *Simonetti v. Selective Ins. Co.*, 859 A.2d 694, 699 (N.J. Super. Ct. App. Div. 2004) ("Mold can be both a loss and a cause of loss. This distinction between mold damage and loss caused by mold is supported by the very language of Selective's policy: '[w]e do not insure, however, for loss *caused by* . . . mold . . .' This language does not exclude all mold. Rather, it excludes loss 'caused by' or resulting from mold. The language clearly focuses on 'cause' of the loss, conveying the intention to exclude mold as a cause of loss. But mold which is the loss is not mentioned. If Selective had intended to exclude not only losses caused by mold, but also mold itself, it could have easily expressed that intention.") (emphasis in original) (citations omitted); *Liristis v. Am. Family Mut. Ins. Co.*, 61 P.3d 22, 25-26 (Ariz. Ct. App. 2002) ("This [policy] language does not exclude all mold. Rather, it excludes loss 'resulting directly or indirectly from or caused by' mold. If American Family had intended to exclude not only losses caused by mold but also mold itself, it could have easily expressed that intention.") (citations omitted).

Travelers responds to Boardwalk's argument that mold can be both a "loss" and a "cause of loss" by relying upon a Wisconsin district court case which rejected a similar argument and a Washington Court of Appeals case which distinguished a similar argument.[4] *See Atlantic Mut. Ins. Cos. v. Lotz*, 384 F. Supp. 2d 1292, 1304 (E.D. Wis. 2005) ("No reasonable insured could read the

---

[4] Travelers also relies upon language in a 2001 unpublished Ninth Circuit case which is not precedent and may not be cited to the courts of the Ninth Circuit. *See* U.S. Ct. App. 9th Cir. Rule 36-3(c).

03cv505

1   deterioration and contamination exclusions and understand them to exclude coverage for a loss

2   directly caused by mold and rot but only if the loss is not in the form of mold or rot.  It is

3   self-evident that if there is a loss in the form of mold or rot, then the loss itself can be directly caused

4   by mold or rot, and there is no reason for Atlantic Mutual to add language to its policy to make this

5   any clearer: the meaning is obvious."); *Wright v. Safeco Ins. Co. of Am.*, 109 P.3d 1, 8 (Wash. Ct.

6   App. 2004) ("Despite Wright's claim that the cause of the mold was non-excluded water leaks, the

7   efficient proximate cause of the mold in the fountain, laundry and exterior wall areas were excluded

8   construction defects.").

9          The Court is persuaded by the rationale of the cases cited by Boardwalk which hold that mold

10  is not excluded when it is the result of an otherwise covered event.  In the words of the court in

11  *Eckstein*: "[T]he loss that followed the water damage was caused by water damage.  It was not

12  caused by mold damage.  The policies here exclude loss *caused by* mold, rot, decay, etc.  The

13  policies do not exclude loss which *is* mold, rot, decay and the like.  The mold exclusion would

14  preclude coverage for mold occurring naturally or resulting from a non-covered event.  But when

15  mold ensues from water damage which is covered under the policy, the mold damage is covered

16  despite the exclusion." *Eckstein*, 469 F. Supp. 2d at 462-63 (emphasis in original) (citation omitted).

17  Viewed in the light most favorable to Boardwalk, the evidence in the record indicates that the

18  damage was caused by water intrusion, including build-up of condensation and leaks through the

19  roof, windows and fireplaces.  (Fact 153.)  Assuming the water intrusion is not excluded by any

20  other provision (such as the design/construction defects exclusion, *see* discussion *infra*), at least a

21  portion of the water intrusion constitutes a covered cause of loss because neither the 2000-01 policy

22  nor the 2001-02 policy excludes loss resulting from condensation, and the 2000-01 policy contains

23  an endorsement deleting the rain exclusion.  (Fact 149.)  To the extent that the mold was a result of

24  this water intrusion, the damage Boardwalk suffered was not, in the terms of the policies, "loss or

25  damage caused by or resulting from . . . mold."  (2000-01 Policy at 314; 2001-02 Policy at 438.)

26         Moreover, even if California courts were to subsequently adopt the argument advocated by

27  Travelers, and all of the mold damage were excluded by the policies as a matter of law, summary

28  judgment could not be granted.  Boardwalk has presented evidence that some of the costs incurred

03cv505

in repairing Building 8840 were for damage other than mold, such as water staining and saturation. (Fact 152.)  There is no evidence that Travelers attempted to apportion payment for damage attributable to covered causes of loss (such as the water staining and saturation) from that attributable to excluded causes (such as, according to Travelers, mold).  Even if California courts adopted Travelers' argument, there would be a triable issue as to the extent of repairs which Travelers is required to cover.

Travelers has failed to show that, as a matter of law, the mold/fungus exclusion in the policies excludes all coverage.

### C.   Design/Construction Defect Exclusion

#### 1.   Relevant Policy Language

The relevant policies each exclude damage caused by design/construction defects. Specifically, the 2000-01 policy states, in pertinent part:

> 3.   We will not pay for loss or damage caused by or resulting from any of the following.  But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.
> . . .
> c.   Faulty, inadequate or defective:
> . . .
> (2)   Design, specifications, workmanship, repair, constructions, renovation, remodeling, grading, compaction;
> . . . .

(2000-01 Policy at 316.)  Similarly, the 2001-02 policy states, in pertinent part:

> 3.   We will not pay for loss or damage caused by or resulting from any of the following, but if an excluded cause of loss that is listed in 3.a. through 3.c. below results in a Covered Cause of Loss, we will pay for loss or damage caused by that Covered Cause of Loss:
> . . .
> c.   Faulty, inadequate or defective:
> . . .
> (2)   Design, specifications, workmanship, repair, constructions, renovation, remodeling, grading, compaction;
> . . . .

(2001-02 Policy at 439.)

#### 2.   Discussion

Policy provisions of this type are referred to as "resulting loss" or "ensuing loss" provisions and "apply to the situation where there is a 'peril,' i.e., a hazard or occurrence which causes a loss or injury, *separate* and *independent* but resulting from the original excluded peril, and this new peril

03cv505

1   is not an excluded one, from which loss ensues." *Acme Galvanizing Co. v. Fireman's Fund Ins. Co.*,

2   221 Cal. App. 3d 170, 179-80 (Cal. Ct. App. 1990) (emphasis in original).  In *Acme*, the plaintiff

3   was insured under an "all risk" commercial insurance policy when a steel kettle at its plant ruptured,

4   causing several tons of molten zinc to spill onto surrounding equipment. *See id.* at 173.  The insurer

5   denied coverage for the plaintiff's loss on the basis that the loss was not caused by an external cause

6   but by a latent defect or inherent vice in the kettle itself, which was excluded from coverage.  *See*

7   *id.*  The plaintiff argued the applicability of a provision "which provides coverage for a loss

8   precipitated by an excluded peril where a 'loss by a peril not otherwise excluded ensues,'" under

9   which circumstances the insurer pays for "only such ensuing loss."  *Id.* at 179.  The plaintiff

10  contended, "even if the kettle rupture was caused by a latent defect, the discharge of molten zinc

11  which damaged or destroyed the surrounding equipment was an 'ensuing loss' not excluded from

12  coverage." *Id.*  Affirming the trial court's grant of nonsuit in favor of the insurer, the appellate court

13  stated: "Here, there was no peril separate from and in addition to the initial excluded peril of the

14  welding failure and kettle rupture.  The spillage of molten zinc was part of the loss directly caused

15  by such peril, not a new hazard or phenomenon.  If the molten zinc had ignited a fire or caused an

16  explosion which destroyed the plant, then the fire or explosion would have been a new covered peril

17  with the ensuing loss covered.  That did not occur."  *Id.* at 180.

18          In this case, both parties argue that *Acme* supports their respective positions.  Travelers

19  argues that this case is similar to the facts of *Acme*, in that "[t]he condensation was part of the loss

20  directly caused by the excluded design/construction defect (lack of ventilation), not a new hazard

21  or phenomenon." (Mem. Supp. Summ. J. at 20-21.)  Boardwalk counters that this case is similar

22  to the "fire or explosion" hypothetical in *Acme*: "The excluded peril (or 'cause of loss') asserted by

23  Travelers is [allegedly] defective design or construction (i.e., the inadequate dryer, bathroom, and

24  roof ventilation).  The excluded peril (inadequate ventilation) resulted in a covered peril–i.e., the

25  build up of condensation.  The covered peril of condensation resulted in the damage–e.g., water

26  staining, saturation, and mold.  Because the damage results from a covered peril, it is covered–even

27  though the covered peril was caused by an excluded peril." (Mem. Opp'n Summ. J. at 16-17.)

28

The Court finds Boardwalk's analysis to be the appropriate application of the facts of this case to the law as stated in *Acme*. According to one expert report, "the mold remediated in 2002 was caused by the build up of excessive condensation of moisture in the roof and wall cavities resulting from inadequate or non-existent ventilation systems." (Fact 101.) Condensation, a covered peril, is "a hazard or occurrence which causes a loss or injury, *separate* and *independent* but resulting from the original excluded peril," lack of ventilation. *Acme*, 221 Cal. App. 3d at 179-80 (emphasis in original). The deciding factor for the court in *Acme* was that "[t]he spillage of molten zinc was part of the loss directly caused by such peril, not a new hazard or phenomenon." *Id.* at 180. By contrast, condensation, while "resulting from" the lack of ventilation, is a new hazard or phenomenon, separate and independent from lack of ventilation.

Even viewing *Acme* in the manner argued by Travelers, summary judgment on the basis of the design/construction defect exclusion would be inappropriate for two independent reasons. First, Travelers assumes that the lack of ventilation in the roof, bathrooms and laundry rooms constitute design and/or construction "defects" as a matter of law. Neither party cites to any language in the policy or in caselaw which defines "defective." Boardwalk has presented evidence that at the time Building 8840 was constructed, the applicable building codes did not require mechanical venting to the outside for the bathrooms or dryers. (Fact 150.) There also is an issue of fact as to whether the roof of Building 8840, which was installed in 1996-97, complied with all applicable building codes and construction industry practices. (*Compare* Fact 151 *with* Fact 104.) Additionally, the roof was inspected and warranted by the manufacturer. (Fact 151.) This evidence is sufficient to create an issue of fact as to whether the lack of ventilation was "defective."

Second, even assuming the lack of ventilation constituted a "defect" as a matter of law, Travelers has failed to show that, as a matter of law, the loss was caused solely by lack of ventilation. Boardwalk has presented evidence of other potential causes of Boardwalk's loss, including roof leaks, window leaks and leaks around the fireplaces (Fact 153), and Travelers has failed to show that these additional causes constitute design and/or construction defects as a matter of law. When there is sufficient evidence to support the possibility that the "efficient proximate cause" (i.e., the cause that sets the other causes in motion) is either an excluded peril (i.e., under

03cv505

1  Travelers' theory, lack of ventilation) or a covered peril (i.e., leaks), "the question of causation is

2  for the jury to decide." *Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d 395, 412-13 (Cal. 1989)

3  ("Coverage should be determined by a jury under an efficient proximate cause analysis. . . .  If the

4  earth movement was the efficient proximate cause of the loss, then coverage would be denied. . . .

5  On the other hand, if negligence was the efficient proximate cause of the loss, then coverage exists.

6  . . . These issues were jury questions because sufficient evidence was introduced to support both

7  possibilities.") (citations omitted).

8         Travelers' Motion for Summary Judgment on the basis of the design/construction defect

9  exclusion is denied.

10         **D.    Bad Faith**

11         Travelers argues that summary judgment should be granted as to Boardwalk's claim that

12  Travelers breached the implied covenant of good faith and fair dealing because as a matter of law

13  Travelers did not deny benefits in bad faith.

14         "The covenant of good faith and fair dealing has particular application to insurers because

15  they are invested with a discretionary power affecting the rights of another, and the insurance

16  business is affected with a public interest and offers services of a quasi-public nature.  Reflecting

17  the importance of insurers' good faith obligations, bad faith by an insurer is subject to tort remedies,

18  including punitive damages." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir.

19  2002) (citations and quotations omitted) (applying California law).

20         "The key to a bad faith claim is whether or not the insurer's denial of coverage was

21  reasonable.  The reasonableness of an insurer's claims-handling conduct is ordinarily a question of

22  fact." *Id.* (quotations and citations omitted); *cf. Chateau Chamberay Homeowners Ass'n v.*

23  *Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 350 (Cal. Ct. App. 2001) ("Although an insurer's

24  bad faith is ordinarily a question of fact to be determined by a jury by considering the evidence of

25  motive, intent and state of mind, the question becomes one of law when, because there are no

26  conflicting inferences, reasonable minds could not differ.") (quotation omitted).

27         The California Court of Appeals recently stated:

28         It is now settled that an insurer denying or delaying the payment of policy benefits
         due to the existence of a genuine dispute with its insured as to the existence of

15

03cv505

coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract.  On the other hand, if the insurer denies benefits unreasonably (i.e., without any reasonable basis for such denial), it may be exposed to the full array of tort remedies, including possible punitive damages.  The reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors.

. . . .

[A]n insurer owes a duty to its insured to investigate all of the possible bases of an insured's claim.  The insurer's duty to give as much consideration to the insured's interests as it does to its own obligates it to investigate a claim thoroughly.  An insurer must fully inquire into the bases for the claim; indeed, it cannot reasonably and in good faith deny [benefits] to its insured without thoroughly investigating the foundation for its denial.  An insurance company may not ignore evidence which supports coverage.  If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing.

*Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1073 (Cal. Ct. App. 2007) (quotations and citations omitted).  The insurer also has a duty to "conduct a . . . timely investigation of [the insured]'s claim." *Id.* at 1076.  As a threshold matter, the insured must prove that there is coverage under the policy. *See id.* at 1078 ("[I]t is important to make clear that in order for Jordan to recover on her remaining claim of bad faith, it will be necessary for her to first establish a basis for coverage. . . . An insurer's failure to investigate, upon which Jordan's claim of bad faith entirely rests, is not separately actionable if there is no coverage.  If there is no coverage, then any failure by Allstate to properly investigate would not have caused Jordan any damage.").

Travelers argues that even if there is coverage under the policies, Travelers' reliance on the manifestation rule (which was at issue in the first summary judgment motion), as well as the two exclusions at issue here, was reasonable as a matter of law.

This Court's ruling in favor of Travelers on the first summary judgment motion does not establish reasonableness as a matter of law.  In *Filippo Industries, Inc. v. Sun Insurance Co. of New York*, 74 Cal. App. 4th 1429, 1440-42 (Cal. Ct. App. 1999), the California Court of Appeals held that there is no presumption of good faith when the trial court ruled in the insurer's favor on summary judgment, and that ruling is later reversed.  Moreover, "[w]hen an insured bases claims for bad faith on several different claims decisions or courses of conduct, a carrier should not be permitted to defeat all of them by showing that there was a genuine dispute as to just one." *Bernstein v. Travelers Ins. Co.*, 447 F. Supp. 2d 1100, 1111 (N.D. Cal. 2006) (applying California law).

03cv505

Boardwalk argues that a jury could find that:

> Travelers' handling of Boardwalk's claim was dilatory and unreasonable from start to finish. Among other things, Travelers ignored Boardwalk's claim for months at a time (Facts 106(b), 110, 53, 54, 128); never agreed to a scope of loss with its insured, but expected individual homeowners to approach Travelers on an ad hoc basis (Facts 112, 119-125); criticized Boardwalk for not making repairs that Travelers should have arranged and paid for (Facts 46, 109-112); informed Boardwalk that further investigation would be necessary to differentiate between covered and excluded causes of loss and then immediately stopped investigating (Facts 51-54, 124-128); made a partial payment to Boardwalk for damages resulting from covered causes of loss, but upon realizing the potential size of the claim, ceased all adjustment of the claim (Facts 119-128); demanded copious and irrelevant records from Boardwalk, but refused numerous invitations to inspect and copy those records (Facts 53-54, 129-130, 136-143); ignored Boardwalk's pleas for assistance in the face of financial disaster occasioned by Travelers' abandonment (Facts 131-134); and wrongfully accused Boardwalk of failing to cooperate with Travelers (Facts 46, 50, 62).

(Mem. Opp'n Mot. Summ. J. at 22-23.)  Travelers responds Boardwalk failed to cooperate with Travelers' investigation of the claim, and also failed to mitigate its damages as required by the policies.  (Reply Mem. Supp. Mot. Summ. J. at 9.)

The Court finds that, viewing all inferences in the light most favorable to Boardwalk, there is a genuine issue of fact as to whether Travelers' conduct handling the claims was reasonable. There were numerous delays and apparent miscommunications during the claim investigation process, particularly after Boardwalk's claim was transferred from Blanchard to Luoma.  The evidence submitted would permit a jury to blame Travelers for the delays and miscommunications and find that Travelers "fail[ed] to conduct a full, fair, thorough and timely investigation of [Boardwalk]'s claim." *Jordan*, 148 Cal. App. 4th at 1076.  Therefore, Travelers' Motion for Summary Judgment as to Boardwalk's bad faith claim is denied.

### E.    Punitive Damages

Travelers moves for summary judgment as to Boardwalk's claim for punitive damages, arguing that no reasonable jury could find that Travelers has been guilty of oppression, fraud or malice.

"Punitive damages are available 'if in addition to proving a breach of the implied covenant of good faith and fair dealing proximately causing actual damages, the insured proves by clear and convincing evidence that the insurance company itself engaged in conduct that is oppressive, fraudulent, or malicious.'" *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1164 (9th Cir.

17

2002) (quoting *PPG Indus. v. Transamerica Ins. Co.*, 20 Cal. 4th 310, 975 P.2d 652, 658 (1999);

citations omitted).

In *Amadeo*, the Ninth Circuit, applying California law, stated:

> Determinations related to assessment of punitive damages have traditionally been left
> to the discretion of the jury.  Viewed most favorably to Amadeo, there is sufficient
> evidence that the denial of her claim was not simply the unfortunate result of poor
> judgment, but rather resulted from Principal's plainly unreasonable interpretation of
> its policy and the deliberate restriction of its investigation in a bad faith attempt to
> deny benefits due to Amadeo.  Thus a jury might conclude that Principal's actions
> were willful and rooted in established company practice.  We therefore reverse the
> grant of summary judgment against Amadeo on her claim for punitive damages,
> leaving to the jury the assessment of whether such damages are warranted.

*Amadeo*, 290 F.3d at 1165 (quotations omitted).  Punitive damages must be proven by clear and

convincing evidence.  *See Jordan*, 148 Cal. Rptr. 4th at 1080 ("In other words, it will not be enough

to show, by a preponderance of the evidence, that Allstate had engaged in bad faith claims handling

practices.  Jordan, in order to recover punitive damages, must also demonstrate by clear and

convincing evidence that Allstate acted with malice, oppression or fraud....").

Travelers argues that Boardwalk cannot meet this burden of showing "malice, oppression or

fraud."  Boardwalk relies upon the arguments and evidence recounted above with respect to its bad

faith claim.  Boardwalk cites to the following language from a California Court of Appeals decision:

> In light of [the insurer]'s near reflexive denial of the severely maimed Wilcox's
> employment status and entitlement to workers' compensation benefits, not to mention
> their subsequent long-term refusal to budge from that position, the evidence was
> consistent with intentional fraud, and not consistent with mistake, honest error,
> negligence, and the other innocuous examples listed in *Tomaselli*. . . . [A]n absolute
> unwillingness even to attempt performance gives rise to an inference of fraudulent
> intent.

*Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal. App. 4th 1020, 1050-51 (Cal. Ct. App.

2003) (citing, *inter alia*, *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1288 n.14

(1994) (stating that punitive damages should not be allowed where the offending conduct is not

inconsistent with "a mistake of law or fact, honest error of judgment, over-zealousness, mere

negligence or other such noniniquitous human failing")).  Boardwalk states: "Similarly, in the

present case, once Travelers realized how expensive Boardwalk's claim was going to be, it

'reflexively' denied that claim, despite the clear weight of legal authority and industry custom and

03cv505

1 practice indicating that the claim should be covered, and has refused to budge from that position."

2 (Mem. Opp'n Mot. Summ. J. at 26.)

3        Viewing the evidence in the light most favorable to Boardwalk, the Court finds that evidence

4 has not been presented which would allow a jury to find by clear and convincing evidence that

5 Travelers engaged in oppressive, fraudulent, or malicious conduct.  The facts of this case are similar

6 to those in *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269 (1994), wherein the California

7 Court of Appeals affirmed a jury award on an insured's bad faith claim against a property insurer,

8 but reversed a jury award of punitive damages.  The court first noted that "punitive damages have

9 been assessed against insurance companies most commonly where a showing has been made of a

10 continuous policy of nonpayment of claims. . . .  [T]here was no showing that the inadequacy of

11 appellant's claims administration was part of a course of conduct.  No evidence was introduced as

12 to appellant's handling of other claims.  This is not a case, therefore, in which punitive damages are

13 warranted to punish for the maintenance of evil policies which damage the public in general."  *Id.*

14 at 1287-88 (citations omitted).  The court later stated:

15        In summation, the actions of appellant may be found to be negligent (failing to follow
         up information provided by the insured), overzealous (taking an unnecessary
16        deposition under oath of the insured), legally erroneous (relying on an endorsement
         which was not shown to have been delivered), and callous (failing to communicate).
17        There was nothing done, however, which could be described as evil, criminal,
         recklessly indifferent to the rights of the insured, or with a vexatious intention to
18        injure.  There is simply no evidence supporting a punitive damage award in this case,
         and the award must be reversed in its entirety.
19
*Id.* at 1288.  Similarly, Boardwalk has introduced no evidence "showing that the inadequacy of
20
[Travelers'] claims administration was part of a course of conduct."  *Id.* at 1288.  Moreover, while
21
the evidence, viewed in the light most favorable to Boardwalk, would permit a jury to find
22
Travelers' actions to be unreasonable, obtuse, legally erroneous and callous, "[t]here was nothing
23
done, however, which could be described as evil, criminal, recklessly indifferent to the rights of the
24
insured, or with a vexatious intention to injure."  *Id.* at 1288.  Therefore, Travelers' Motion for
25
Summary Judgment as to the claim for punitive damages is granted.
26
        **F.     Evidentiary Objections**
27
        Travelers' objection (Doc. # 119) to the three-page "letter brief" that accompanied
28
Boardwalk's submission of supplemental authority (Doc. # 118) is **SUSTAINED**.

1    All objections to evidentiary materials supporting the Facts cited in this Order are

2  **OVERRULED**.  All objections to evidentiary materials supporting Facts not cited in this Order are

3  **DENIED** as moot.

4                                     **CONCLUSION**

5    For the reasons stated above, Travelers' Motion for Summary Judgment (Doc. # 105) is

6  **GRANTED IN PART** and **DENIED IN PART**, as follows: the Motion for Summary Judgment

7  is **GRANTED** as to Boardwalk's claim for punitive damages; the Motion for Summary Judgment

8  is **DENIED** in all other respects.

9    No later than seven (7) days from the date of this Order, the parties shall contact the

10  chambers of Magistrate Judge McCurine to schedule the remaining pretrial dates.

11  DATED:  July 3, 2007

12                                       _William Q. Hayes_

13                                  **WILLIAM Q. HAYES**
                                   United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28